HOUSTON & T. C. R. CO. v. SHEPHERD.
(No. 7228.)

Court of Civil Appeals of Texas. Austin.
May 2, 1928.

Rehearing Denied May 23, 1928.

**1. Master and servant** ⬅=204(1)—**Train conductor assumed risk of failure to use spark arresters on oil-burning engine (Federal Employers' Liability Act [45 USCA, §§ 51–59]).**

Spark arresters having never been used on oil-burning engines by any railroad company in Texas, train conductor, injured by hot sand or gravel striking his eye while looking ahead as train drawn by such an engine rounded curve, assumed risk incident to failure to use them, as matter of law, under Federal Employers' Liability Act (45 USCA §§ 51–59; Comp. St. §§ 8657–8665).

**2. Master and servant** ⬅=278(18)—**Evidence, in conductor's action for eye injuries, supported finding that it was not customary to sand engine flues on curve.**

In action for injuries to train conductor by hot sand or gravel striking his eye while looking ahead as train passed around curve, evidence *held* sufficient to support jury's finding that it was not usual or customary for defendant's enginemen to sand flues of engines while rounding curves.

**3. Master and servant** ⬅=216(6)—**Conductor did not assume risk of enginemen sanding flues on curve, if not customary.**

Train conductor, looking ahead from rear platform of rear coach as train rounded curve, in discharge of his duty to ascertain whether anything was dragging or there were any hot boxes, did not assume risk of enginemen sanding flues, if it was not usual or customary to do so while train was rounding curve.

**4. Master and servant** ⬅=206, 226(2, 3)—**Generally, employee assumes risks ordinarily incident to employment, but not those arising from employer's negligence, unless known or obvious.**

Generally, employee assumes risks usually and ordinarily incident to employment, but does not assume those arising from employer's negligence, unless known to him, or so obvious as to charge him with knowledge thereof or duty to know it.

**5. Trial** ⬅=350(6)—**Special issue not submitting questions whether railway company had rule for warning employees of sanding engine flues, and conductor knew cinders might strike eye if done while rounding curve, held not error.**

In action for injuries to train conductor by hot sand or gravel striking his eye while looking ahead as train rounded curve, special issue not submitting questions whether defendant railway company had established rule as to warning employees when engine flues would be sanded, and plaintiff knew that cinders were likely to get in his eyes if flues were sanded while train was rounding curve, *held* not error, where it was conclusively shown that no such rule was established, and jury found it was not usual or customary to sand engine while rounding curve.

**6. Trial** ⬅=232(2)—**Special issue whether injury was due to assumed risk, considering instruction thereon, held properly refused as general charge (Federal Employers' Liability Act [45 USCA §§ 51–59]).**

Issue whether plaintiff's injury was due to assumed risk, bearing in mind instruction that, under Federal Employers' Liability Act (45 USCA §§ 51–59; Comp. St. §§ 8657–8665), he assumed not only all risks ordinarily incident to business in which engaged, but all growing out of defendant's negligence, of which he had knowledge, or which were open and visible to him, *held* properly refused as not a special issue, but general charge on assumed risk.

**7. Trial** ⬅=349(1)—**Purpose of special issue verdict is to confine jury to fact issues submitted.**

One of outstanding purposes of special issue verdict is to confine jury's consideration strictly to issues of fact submitted concretely, as contrasted with general verdict method of stating principles of law involved in issue and requiring jury to determine facts by application thereto of law as charged.

**8. Trial** ⬅=232(2)—**Special charge that conductor assumed risk of injury to eye if railway company had no rules for warning employees of sanding engine flues, and he knew danger, held properly refused.**

In action for injuries to train conductor by hot sand or gravel striking his eye as he was looking ahead while train was rounding curve, charge to answer issues of assumed risk in affirmative, if defendant never promulgated nor enforced any rules for warning employees when engine flues were to be sanded, and plaintiff knew of such fact, and of dangers of looking around side of train while on curve, *held* properly refused as merely general definition of assumed risk, rather than special charge explaining terms or definitions used in special issues referred to, and submitting immaterial issues.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by Leo T. Shepherd against the Houston & Texas Central Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

---

⬅=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes·

Baker, Botts, Parker & Garwood and Garrison & Watson, all of Houston, for appellant.

Fulbright, Crooker & Freeman and John H. Crooker and W. B. Bates, all of Houston, for appellee.

McCLENDON, C. J. Appellee, a train conductor (at the time acting as rear brakeman on a seven-coach interstate passenger train of appellant traveling between Hempstead and Houston), sued appellant for personal injuries, the result of hot sand or gravel striking his eye as he was looking ahead from the left side of the rear platform of the rear coach as the train was passing around a sharp curve toward the left. The appeal is from a judgment in favor of appellee upon a special issue verdict.

Three grounds of primary negligence following were separately submitted, and the jury found the existence of each, and that it was a proximate cause of appellee's injuries: (1) Sanding the flues of the engine as the train was rounding a curve; (2) using sand with small gravel or other small particles in it; (3) failure to use a spark arrester.

[1] The third ground should not have been submitted to the jury, because the evidence conclusively showed that in all oil-burning engines spark arresters were not, and had never been, used by appellant or any other railroad company in Texas, and therefore, under the Federal Employers' Liability Act (45 USCA §§ 51–59; Comp. St. §§ 8657–8665), appellee as a matter of law assumed the risk incident to the failure to use them.

We incline to the view that the second ground of negligence, that of using small gravel or other particles mixed with the sand, was properly submitted to the jury. But, since our holding on the first ground requires an affirmance of the judgment, we will not consider the second.

Alleged error involving the first ground of negligence is predicated upon the following contentions:

(1) That appellee, as a matter of law, assumed the risk incident to sanding the flues while rounding a curve, because the evidence conclusively showed that this was a risk incident to appellee's employment, and, if negligent, was either actually or constructively known to him.

(2) That special issue 4, designed to submit the issue of assumed risk in connection with the first ground of negligence, was erroneous for various specific reasons.

(3) That the court erroneously declined to give appellant's special charge No. 2 upon the general subject of assumed risk.

(4) That the court erroneously refused appellant's special charge No. 3 in explanation of special issue 4 on the subject of assumed risk.

All other errors assigned relate to issues other than the first ground of negligence, and become immaterial, if the four enumerated contentions are denied.

Upon the first contention, to the effect that appellee assumed as a matter of law the risk incident to sanding the flues while rounding a curve, the record briefly stated shows:

Appellee had been in appellant's employ since 1907, first as call boy, then brakeman, and finally, since 1914, conductor. At the time of his injuries, he was on a run from Ennis to Houston as volunteer rear brakeman, meaning that he voluntarily took the run in that capacity, but drew conductor's pay. His train was rounding a sharp curve toward the left shortly after leaving Hempstead. He looked ahead from the left rear platform to ascertain whether anything was "dragging" or there were any hot boxes. Just as his head emerged beyond the side of the car, he was struck in the eye by a large piece of sand or gravel or other substance which caused him to lose his eyesight. Substantially coincidently he observed black smoke coming from the engine, indicating the flues were being sanded. This sanding of oil-burning engines was essential about every 25 or 35 miles in order to clean out the flues; and was performed by the fireman, who deposited the sand in a funnel projected through the door of the fire box, whence the sand was forced through the flues, cutting out the soot. There were no rules of the company with reference to when sanding should be done other than rule 886, which provided that enginemen "must use every precaution to avoid setting fires along the line; and, as far as practicable, must sand flues in the vicinity of working gangs, and avoid doing so where wooden structures may be endangered." A number of witnesses testified that the time and place of sanding was left discretionary with the enginemen. Rule 880 of appellant reads:

"Enginemen must keep a constant and vigilant lookout, carefully note all signals; see whether other trains are displaying proper signals, and, while running, observe the position of switches. They must watch for obstructions and defects in track, and frequently look back for signals and indications of defects in train, especially while rounding curves and approaching sidings."

[2] The following excerpts from the testimony (the first, second, and third from appellee's, and the fourth from the engineer's) give the respective duties of trainmen when rounding a curve:

"There is an established custom with respect to the duty to be performed by conductors and brakemen upon the train passing around a curve. That duty and custom is that you look your train over around curves to see if anything is dragging, or if there are any hot boxes, or anything that might occur. That duty cannot be accomplished on a straight track as well as it can when the train is going around a curve, because, when the train is rounding a curve, you can see from the head of the engine clear on back to the end of the train. There is

something with reference to that same matter in the rule book. It is rule 105 in the printed rule book furnished by the railroad company to its employees. In addition to printing and distributing this rule book among its employees, the railroad company has an instruction car that comes around, and they instruct you about every precaution for safety, and that is one of the things they ask you, about looking out for the trains going around curves. Mr. Irvin and Mr. Otis ask you those questions in the instruction car that comes around twice a year, and you have to pass the examination, and they give you a card showing whether you passed. They come around and tell you to take every precaution for the safety of the train. These men in charge of the instruction car told me to take every safety precaution that can be taken, and looking over the train when it is rounding a curve is one of them. Just like I said, you are supposed to look your train over going around curves. That is the substance of what they said, to look the train over going around curves to see if anything might be dragging, or hot boxes or anything that might affect the equipment. They instructed all of the brakemen to that effect; that was the instruction to the whole class."

"I said that instruction car came around twice a year. I think they have been using that instruction car for about three or four years now. They also have a trainmaster, and he will give you demerits if you do not look your train over. They have been giving that instruction to look the train over when it is rounding a curve ever since I went to work as a student brakeman. The trainmaster and conductor used to give that instruction."

"Before I stuck my head out on this particular occasion I did not have any reason to know, and did not know, that they were going to sand out the engine at that time and place. I did not expect the fireman to sand out the engine when he was going around a curve, because it is his duty to look back going around a curve, and also to look ahead, because the engineer's view is obstructed. The fireman cannot perform the duties which I have just mentioned and sand the engine at the same time, because, in order to sand the engine, he has to get down in the middle of the engine cut. The fire box is in the middle of the engine, and, if he is there, he cannot look back; he would have to be up on his seat box in order to look ahead and backward. He looks through the windows in the cab right there by his seat box. The conductor and brakeman back in the train are familiar in a general way with the duties of the fireman and engineer, and the fireman and engineer in a general way are familiar with the duties of the conductor and brakeman. I know about the fireman's duty to look back over the train when it is rounding a curve, and I also know about his duty to look ahead on account of rounding the curve, because the engineer's view was obstructed.

"The instructions which were given to the conductors and brakemen with reference to looking over the train when rounding a curve were also given to, and known by, the engineers and firemen. I know that to be true, because they all came into the instruction car at the same time we did; engineers, firemen, and all were in the instruction car at the same time, so each knew what the instructions were to the other."

"* * * The matter of when and where to sand the engine is a matter about which the engine crew ordinarily uses their discretion, but, of course, that does not mean that we sand it anywhere without reference to the surroundings. I mean just what I said, we use the best judgment of which we are capable. Technically speaking, if the engine is leaking and losing steam, we use the sand. The thing I am testifying about is that the brakeman and conductor have no business to know how the engine is steaming; they have no jurisdiction over it. The engine is under the control and custody of the engineer and fireman. Obviously that would not mean that just because we had the right to sand that engine when we thought it required it that we would do it at a time and place where it would hurt somebody; safety is always first. It is up to me to run the engine as I choose, yet I would not run over somebody if I saw them out there. When I said it is up to the engineer and fireman to use their discretion, I am talking about the discretion consistent with safety and welfare of everybody. It is not the right of the engineer or fireman to do anything that would injure either person or property. We should not jeopardize either person or property. I have a right to open the cylinder cocks and let out steam, but I wouldn't do that if I saw a scary mule out there; yet the negro on the mule wouldn't have any control over the engine."

The fireman testified, in substance, that he never sanded the engine while it was on a curve, because at that time he would have to be observing the train, but that he did whenever necessary do the sanding after the engine had passed the curve, but before the rest of the train had reached the straight track. While he had no recollection of the particular incident, he testified that he did not sand the engine while it was on the curve, and, if he sanded it at all while any part of the train was so situated, it was after the engine had reached the straight track. He and the other trainmen witnesses testified that it was generally the custom to sand the engine while the train was going up grade and the engine "working."

Special issue No. 4 on the issue of assumed risk which was answered in the negative reads:

"Had it been usual or customary prior to and at the time in question for the defendant's enginemen to sand the flues of their engine while the train was rounding a curve?"

We think the evidence stated above sufficient to support this finding, and that it negatives assumption of risk on the part of appellee.

[3] Appellee was in the proper discharge of his duty in looking ahead as he did. If as the jury found it was negligence proximately contributing to appellee's injury to sand the flues as the train was rounding a curve, and if it was not usual or customary for the engine

to be so sanded, then there would be no assumption of risk arising from such negligent act under the facts of this case, because there were no means by which appellee could have known that the engine would be so sanded, and he was not charged with knowledge that a negligent act would be performed, unless it was usual or customary.

[4] Upon this subject, the law is so well established it is unnecessary to cite cases. Generally speaking, the rule is that the employee assumes risks usually and ordinarily incident to his employment, but does not assume those arising from negligence of his employer, unless such negligence is known to him, or was so obvious as to charge him with knowledge thereof, or a duty to know it. The negligent act here complained of arose from the performance of a usual and necessary act in the operation of the train, the ordinary dangers of which were well known to all experienced trainmen, including appellee. The negligence consisted, not in the doing of the act, but in its doing at the particular time and place. It is clear that appellee did not and could not know that the engine would be sanded at this particular time and place, and whether he assumed the risk depends upon whether he ought to have anticipated it. This question. in turn depends upon whether it was usual or customary to sand the engine while the train was rounding a curve; if so, appellee assumed the risk, for he is charged with knowledge of that custom. If, however, such was not the custom, or a usual practice, he did not assume the risk, if the act was negligent. He could not be held to have reasonably anticipated the commission of a negligent act in the operation of the train, unless such act were usual or customary.

[5] Appellant's second contention is predicated upon overruling the following objections:

"Defendant objects to special issue No. 4, for the reason that it does not submit an issue of assumed risk. It is immaterial whether or not the enginemen sanded the flues or whether or not it was customary to sand the flues while the engine was rounding a curve. The only material issues of fact are: (a) Whether or not the defendant company.had established any rules with reference to warning employees when the flues of an engine would be sanded; (b) whether or not the plaintiff knew of such fact; (c) whether or not plaintiff knew that, if the engineer or fireman did sand the flues while the train was rounding a curve, it was likely to get cinders or other hot particles in his eyes; (d) whether or not he would have looked around to observe the train while it was rounding a curve if he had known that the flues of the engine were being sanded; and (f) whether or not, by reason of the fact that he knew and appreciated the danger of getting sand or hot particles in his eyes, he would not have looked while the engine was rounding the curve, and while the flues were being sanded."

We do not concur in the view that either of the enumerated issues were the only material issues of fact in the case, or that they' were material issues at all, as applied to special issue No. 4.

"Whether or not the defendant company had established any rule with reference to warning employees when the flues of the engine would be sanded" was not an issue of fact in the case. It was conclusively shown, as in Railway v. Hawthorne (Tex. Civ. App.) 297 S. W. 321, that no such rule was established, and that plaintiff knew that fact; and, while this was pleaded as an issue of negligence, it was not submitted to the jury. Much stress is laid in the appellant's argument on the holding in the Hawthorne Case. The decision there manifestly has no application here. It was distinctly pointed out in the opinions of the two justices writing that the sole ground of negligence there relied upon was the failure of the railroad company to adopt and promulgate rules for the protection of its employees in the matter of giving warning in the sanding of engines, and the decision was rested solely upon the holding that, since the plaintiff was cognizant of the fact that no such rule had been promulgated, and that no such warning was given, he necessarily assumed the risk incident to the failure to make such rule or give such warning. The opinions limit the decisions to this holding.

"Whether or not plaintiff knew that, if the engineer or fireman did sand the flues while the train was rounding a curve, it was likely to get cinders or other hot particles in his eyes," was manifestly immaterial under the finding that it was not usual or customary to sand the engine while rounding a curve. The reasonable inference to be drawn from appellee's testimony is that he did know that, if the engine was sanded while the train was rounding the curve, he would likely get cinders or hot particles in his eyes. The crucial point upon the issue of assumed risk was not the knowledge appellee may have had of the danger incident to the negligent act, but whether he was charged with knowledge that the act would be performed, or with the duty to anticipate it. The same reasoning applies with equal force, we think, to subdivisions (d) and (f) of this requested charge.

[6] Appellant's third contention is predicated upon the refusal of its requested special issue No. 2, reading:

"In this case you are instructed that under the Federal Employers' Liability Act the plaintiff assumed not only all of the risks ordinarily incident to the business in which he was engaged, but also all of the risks growing out of the negligence of the defendant company of, which he had knowledge or which were open and visible to him and of which, in the exercise of ordinary care, he should have had knowledge.

"Bearing in mind the foregoing instructions, you will answer the following question:

"Was the plaintiff's injury due to a risk assumed by him?

"In connection with and explanatory of the

above issue you are instructed that if you find and believe from a preponderance of the evidence that the defendant at the time plaintiff was injured and long prior thereto had never promulgated or attempted to enforce any rules requiring warning to be given to its employees when the flues of an engine would be sanded, and you further find and believe that the plaintiff knew such fact, and you further find and believe that the plaintiff got a cinder in his eye while the engine was rounding a curve near Hempstead, and that the plaintiff on the rear end of the train, while looking around on the left side to observe the condition of his train, got a cinder in his eye, inflicting the injury complained of, and that the plaintiff looked around, although he did not know when the flues would be sanded, yet if he had had knowledge of and appreciated the danger of getting a cinder in his eye while the flues were being sanded, and had had warning when the flues were to be sanded, he would not have looked, for the reason that he knew and appreciated the danger of getting a cinder in his eye, then you are instructed that the plaintiff would assume the risk, and you will answer the above question 'Yes.' "

[7] This was not in any proper sense a special issue, but a general charge upon the subject of assumed risk. One of the outstanding purposes of the special issue verdict is to confine the consideration of the jury strictly to issues of fact submitted concretely, as contrasted with the general verdict method of stating the principles of law involved in an issue, and then requiring the jury to determine the facts by the application thereto of the law as charged. Issues framed so as to require the jury to apply the law to the facts have been generally condemned under the special issue practice.

[8] Appellant's fourth contention asserts error in refusal of its third special charge reading:

"In connection with and explanatory of special issues Nos. 4 and 5 submitted to you by the court, you are instructed that, if you find and believe from a preponderance of the evidence that the defendant had never promulgated or enforced any rules requiring warning to be given to its employees when the flues of an engine were to be sanded, and you further find and believe from the evidence that the plaintiff knew of such fact, and that he also knew and appreciated the dangers of looking around the side of the train while on a curve and of getting a cinder or hot particle of sand or gravel in his eyes, and that, had he known that the flues were being sanded, he would not have looked around because he knew and appreciated the danger of being injured thereby, and that the failure of the defendant to warn the plaintiff that the flues were being sanded was the direct and proximate cause of plaintiff's looking around, then you are instructed that the plaintiff would have assumed the risk, and you will answer said issues in the affirmative."

This charge is subject to the same objections as appellant's special issue No. 2. It was merely a general definition of assumption of risk, and was not in any proper sense a special charge explaining any terms or definitions which the court had used in special issue No. 4 to which it expressly related. Its refusal was proper under the rule last above announced. It is also subject to the criticisms above applied to the urged objections to special issue No. 4.

The trial court's judgment is affirmed.

Affirmed.